## HELD AT HARTFORD, FOR THE COUNTIES OF HARTFORD, WINDHAM, LITCHFIELD, MIDDLESEX AND TOLLAND,

### ON THE FIRST TUESDAY OF MAY, 1882.

Present,

PARK, C. J., CARPENTER, PARDEE AND LOOMIS, JS.*

GEORGE P. BRINLEY AND OTHERS, TRUSTEES, *vs.* GEORGE GROU AND OTHERS.

A testator dying in 1866 left $100,000 to trustees to be invested and held for his four children equally during their lives, the "rents, dividends, increase and income thereof" to be paid to them annually. The testator owned at his death a large number of shares of a fire insurance company, which went to the trustees as a part of the trust fund at a valuation of $194 per share. The assets of the company then largely exceeded its liabilities. In 1881 the capital of the company was $3,000,000, and its accumulated profits $3,000,000; and the market value of its stock was $282 per share. During that year it increased its capital from three to four millions, apportioning the new shares *pro rata* among the stockholders at $100 per share, the trustees becoming entitled to subscribe for eighty-one shares. The new stock was at once at a large premium and the trustees sold the right to subscribe for thirty-four shares for a sum which enabled them to subscribe and pay for forty-seven shares. After the new stock was issued the dividends on the whole stock were considerably smaller. Held that the right to subscribe for the new shares, the profit on a sale of the right, and the new shares taken, went to the

---

* Judge GRANGER, being occupied with the trial of a long criminal case in the Superior Court, was not present at any time during the term. His place was supplied by Judge BEARDSLEY of the Superior Court in the first five cases.

trustees as a part of the principal of the fund and not to the children as a part of the income.

And held that the term "increase," in the provision of the will that the "rents, dividends, increase and income" of the fund should be paid to the children annually, was not to be construed, so far as it applied to this part of the fund, as meaning anything more than dividends.

And that it was not enough to vary this construction that the insurance company had in the testator's lifetime on three occasions increased its capital, and that he might have foreseen that it would do so again.

CIVIL SUIT for advice as to the construction of the will of John Grou and the duty of the plaintiffs as trustees under it; brought to the Superior Court in Hartford County, and, upon an agreement as to the facts, reserved for the advice of this court. The case is sufficiently stated in the opinion.

*W. Hamersley*, for the plaintiffs.

*C. E. Perkins*, for T. J. Vail, one of the defendants.

1. The words "rents, dividends, increase and income," have as used in the will substantially the same meaning. *Hyatt* v. *Allen*, 56 N. York, 553.

2. Assuming that they mean the same thing, the new stock does not go to the children under that provision, but the right to subscribe for it belongs to the trustees as holders of the original stock. It is not the case of a stock dividend, when, instead of paying profits in cash, they are capitalized and turned into additional stock. There are conflicting decisions as to the rule of law applicable to such cases, although, with the exception of Pennsylvania, I believe it is held everywhere that cash dividends go to the tenants for life, and stock dividends to the remainder-man. See Perry on Trusts, § 545 and note ; *Minot* v. *Paine*, 99 Mass., 101 ; *Leland* v. *Hayden*, 102 id., 542. Whatever might be the rule applicable there, this case is entirely different, both in fact and in principle. This was new stock, for which the subscriber paid in cash, his advantage being merely in the value being greater than the amount that had to be paid. But the claim on the other side is, that this difference in

value represented a surplus which was the product of the old stock and might have gone into dividends to which the children would have been entitled, and that they are therefore entitled to the benefit of this surplus in the form in which it was distributed among the stockholders. But a stockholder is never entitled individually to a share of the surplus in such a case until it has been set apart as a dividend, and much less would a tenant for life be, the latter having no claim upon the stock itself, however its value may be increased by the surplus, but only upon the dividends when separated from it. Besides this, the mere surplus, in a case like this, does not give the whole value to the stock beyond par. The organization of the company, its vast and complete system of agencies, its great reputation, its long existence and credit, have much to do in giving value to its stock. It is well settled in this state, as well as elsewhere, that the surplus as well as the capital is a part of the stock itself, and belongs solely to the corporation until it is separated and declared· as a dividend. *Phelps* v. *Farmers & Mechanics Bank*, 26 Conn., 272; *Hyatt* v. *Allen*, 56 N. Y., 553; *Williston* v. *Michigan· &c. R. R. Co.*, 13 Allen, 400; *March* v. *Eastern R. R. Co.*, 43 N. Hamp., 515. The surplus of this company, the day before the increase, was the property of the estate as much as the capital. Nothing was added to it by .the increase, and the day after it still belonged to the estate just as it did the day before. The only difference was·that each share of stock had a smaller share of the surplus. connected with it than it had before. There was nothing in the transaction of increase of the capital stock which changed the amount or nature of the surplus, or the respective rights of the life-tenant and the remainder-men in it.

This precise question, it is believed, has arisen in only two cases. In *Akins* v. *Albree*, 12 Allen, 359, it was held in just such a case that the new stock was a part of the principal and went to the remainder-man. In *Moss's Appeal*, 83 Penn. St., 264, the Supreme Court of Pennsylvania, in a case exactly like this, held the same way.

Whatever may be said of the rule applicable to stock dividends, or the decisions on that subject, no court of superior or inferior jurisdiction has, it is believed, ever held that in a case of this sort the tenant for life took any interest in the additional stock.

*G. Collier* and *R. Welles*, for G. Grou, W. D. Grou and Mary J. Vail, defendants.

1. If the word *increase* was used by the testator in its natural, usual and primary sense, it is clear that the new stock belongs to those having the life use, and this is the construction that should be given to the language of a will. *Allyn* v. *Mather*, 9 Conn., 125; *Gold* v. *Judson*, 21 id., 625.

2. But if it be claimed that ordinarily the words *rents*, *dividends, increase and income* would be construed as synonymous, reference may be had to the situation of the testator's property to raise a latent ambiguity as to *increase.* *Brainerd* v. *Cowdrey*, 16 Conn., 11; *Ayers* v. *Weed*, id., 302; *Bond's Appeal from Probate*, 31 id., 190. The fact appears that the stock of the insurance company had been in possession of the testator for many years, and that, while he possessed it, three several times the stock had been *increased* by the same process as that by which the last increase was made; and it is altogether probable that he had this same stock in view when he directed that the property should remain invested as invested by him. The fair and natural inference is that the testator had in his mind the circumstances under which the stock had *increased* while in his possession, and that he used the word *increase* in order to describe a future apportionment of new stock. He could have used no other word so aptly to describe the fact.

3. But the testator's children are entitled to the new stock under the proper construction of the other words used, or as rents, dividends, and income. It is assumed that if the new stock had been issued without the payment to the company of anything—if the new stock had only represented accumulated profits, and the market

value of the stock had been reduced *pro tanto*, as it
theoretically should have been by such a stock dividend,
then the new stock would have belonged to those given the
life use as income and dividend. This is the modern Amer-
ican doctrine, and the tendency of the late English cases is
in the same direction. The leading case in this country is
*Earp's Appeal*, 28 Penn. St., 368. The testator bequeathed
to his four children, *the rents, income and interest* of certain
stocks. It was held that the accumulations of stock after
the death of the testator was *income*. The court say:—
"The omission to distribute it semi-annually, as it accu-
mulated, makes no change in its ownership. The distribu-
tion of it among the stockholders in the form of new
certificates, has no effect whatever upon the equitable right
to it." In an elaborate opinion the early English cases are
reviewed and disapproved. This case was followed in New
York with approval in the case of *Clarkson* v. *Clarkson*, 18
Harb., 649. The testator left two shares of his estate to
trustees "to pay the *interest, dividends and increase*" to his
two daughters, for the term of their natural lives. It was
similar to the present case in this — that the testator
bequeathed a *definite portion of his estate* in trust, and not
stocks *eo nomine*. The court say, (p. 651),—"There is noth-
ing in this clause of the will expressly requiring the capital
of these two shares to be increased by accumulations arising
from the proceeds of the shares themselves; neither is there
anything from which such an intention can be inferred,
while there is much tending to the conclusion that the
testator intended that all the profits and income of every
kind and nature whatsoever, arising from these two shares,
however invested, should go to the use and benefit of his
two daughters. * * 'Dividends,' as used in the will, is
unqualified; it includes in its technical sense, as well as in
its ordinary and common acceptation, all distributions to
corporators of the profits of the corporation, whether such
distributions are large or small; or whether made at long or
short intervals; and without any regard to the manner or
place of their declaration or mode of payment." The early

English cases are disapproved. Even Lord ELDON, in *Paris* v. *Paris*, 10 Ves., 185, says:—"As to the distinction taken between stock and money, it is *too thin.*" This doctrine was further followed in New York in the case of *Simpson* v. *Moore*, 30 Barb., 637. A bank charter had expired, and the bank re-organized under the general banking law, but made a dividend of eighteen per cent., which the trustee elected to take in stock in the new bank. Held that as part of the dividend was held as capital when the stock was purchased, the original investment must be preserved, and the residue paid to the life-tenant. In *Van Doren* v. *Olden*, 19 N. Jer. Eq., 176, the English and American cases are reviewed, and *Earp's Appeal* and the New York cases are approved as announcing correct principles in preference to the early English cases. In *Wiltbank's Appeal*, 64 Penn. St., 256, the doctrine of the above cases was carried to its legitimate conclusion as we claim it. A testatrix gave her estate in trust to pay her daughter $1,400 annually from the income, and the remainder of the income to her son. Part of the trust fund was stock in two corporations, one of which ordered an increase of stock, to be distributed to the old stockholders on payment of $75 per share. The trustee sold the privilege to subscribe. The other made a similar order. The trustee advanced money, subscribed for the stock, sold it at an advance, and carried what was received in both cases to the trust account. Held that these items were income and not capital. In the still later case of *Lord* v. *Brooks*, 52 N. Hamp., 72, the foregoing decisions are cited with approval, while the English and Massachusetts decisions are said to be unsatisfactory. The court, (p. 85,) express some doubt whether a corporation has the legal power to capitalize earnings so as to divert income from the life tenant to the remainder-man, especially where the surplus is simply kept to protect the capital, and is not actually appropriated and expended on the principal, as in the erection of buildings, etc. See also *Pratt* v. *Pratt*, 33 Conn., 446. We insist that there is no difference in principle between a stock dividend pure and simple and this

increase of one-fourth new stock which has taken away one-fourth of the former surplus and earnings, which one-fourth if put into a dividend would have belonged to the life-tenants, but is now in the hands of the trustees. That the $3,000,000 surplus of undivided profits equitably belonged to the stockholders, and in this case to the parties having the life use, has been practically decided in this state. In *State* v. *Phœnix Bank*, 34 Conn., 239, BUTLER, J., says:— "The accumulation of the surplus was not an essential part of the business of the bank. It was organized upon the idea that its earnings would be divided as earned, and a court of equity would have compelled a division of them if unjustly accumulated and withheld, for every stockholder, qualified or absolute, became an equitable owner in the earnings as soon as earned, and entitled to an equal share in and a reasonable division of them." See also *Beers* v. *Bridgeport Spring Co.*, 42 Conn., 17. In the earlier case of *Phelps* v. *Farmers & Mechanics Bank*, 26 Conn., 269, ELLSWORTH, J., (p. 272,) says:—"If a bank has a certain defined surplus, which has actually been separated and made distinct, and is so known and treated by contracting parties or by the statute, it is possible it may, in that case, be held to possess a new character and be dealt with accordingly." It was held in this case that the *undeclared* profits were mere increment of the stock; but in the recent case of *Vail* v. *Vail*, 49 Conn., 52, LOOMIS, J., in commenting upon that case, says:—"But suppose a life estate had been created in the stock by contract or bequest, is it not too obvious for argument that the court never would have held that the profits were a mere augmentation of the stock, and that the dividends out of the surplus fund must pass into the hands of the owner of the stock itself, in defiance of the terms of the contract or bequest. ELLSWORTH, J., by anticipation guards against any such misapplication of the principle by recognizing the fact that it would be possible by contract or otherwise to impress a different character on the profits, which might in legal effect separate them from the stock." And it was held that the bequest to Mrs. Vail

did have the effect to separate the profits from the stock in advance and to vest them in her husband as trustee, so that the law of 1878 could not affect those thereafter earned. So that the equitable rights of these life-tenants attached to these earnings and became vested when the will became operative, and these rights cannot be affected by the legislature, the company, or the trustees. But twenty-five per cent. of these earnings have been in fact diverted from the old stock, and put by these trustees into new, and if the new stock does not belong to the life-tenants then they have lost just so much of their own.

4. It is no objection to this view that the value of the stock declined after the new issue. It declined no more than if a dividend of twenty-five per cent. had been declared, as already shown. The stock doubtless increased in value because of the proposed increase of stock. It is no reason why our property should be wholly confiscated because somebody else may sustain a small loss. The intent of the testator should be carried out even if the value of the capital should be diminished. *Balch* v. *Hallet*, 10 Gray, 403.

PARDEE, J. John Grou died in 1866, leaving a will containing the following clause:—" I give, devise and bequeath to George Brinley, Oliver G. Terry and William J. Hamersley, and their successors in office, the sum of one hundred thousand dollars, to have and to hold the same upon the trust and confidence following: that is to say, they shall invest and hold the same for the use and benefit of my four children, John Grou, Jr., George Grou, Mary J. Vail, and William D. Grou, during their natural lives, and shall pay to them equally the rents, dividends, increase and income thereof annually, after deducting the expenses of said trust, one-fourth to each during his or her life. If any of my children should die leaving issue living at their decease, his share or her share shall then be transferred to said children free from said trust; but if any should die leaving no children, the same shall be held in trust for the use and

benefit of the survivors; and if all die without issue, then the estate is to go to my legal heirs."

The testator at the time of his death was the owner of three hundred and thirty-three shares of the stock of the Ætna Insurance Company; of these shares two hundred and forty-four became a part of the fund then created at a valuation of $194 per share. The assets of the company then exceeded its liabilities to the amount of about $355,000. In 1881 the capital of the company was $3,000,000; its accumulated profits $3,000,000; and the market value of a share was $282. In that year it increased its capital from $3,000,000 to $4,000,000, apportioning the ten thousand new shares *pro rata* among the stockholders, they paying in $100 per share. The trustees thereby acquired the right to subscribe for eighty-one and one third shares; they sold the right to subscribe for thirty-four and one third shares, receiving therefor $4,859.50; and of this sum they applied $4,700 to payment for forty-seven shares. After the increase the market value of a share was $232; in February, 1882, the date of this complaint, it was $235. The dividend for the year preceding the increase was twenty per cent; for the year succeeding, sixteen per cent.

The plaintiffs, the trustees under the will, allege that George Grou, William D. Grou and Mary J. Vail (John Grou, Jr., having died without issue and they taking his interest as survivors,) claim to be entitled to receive these forty-seven shares of new stock in the proportion to which they are entitled to the annual rents, dividends, increase and income of the trust fund, and that it should be transferred to them; and that Thomas J. Vail, husband of Mary J. Vail, claims that these forty-seven shares are, and should remain, a part of the capital of the fund.

The trustees ask the Superior Court to determine the following questions:—

1st. Whether the legal effect of the provisions of the trust in the will is such as to entitle the *cestuis que trust* to the right to subscribe to the new stock.

2d. Whether the provisions of the trust require the

plaintiffs to hold as a part of the trust fund the new stock so purchased by them, or to divide the same among the *cestuis que trust*, as a part of the rents, dividends, increase and income of the trust fund.

3d.　Whether the *cestuis que trust* are entitled, as a part of the rents, dividends, increase and income of the trust fund, to subscribe for any portion of the new stock, or are entitled to any proportion of the profits that may arise from the purchase and sale of the new stock, or to any proportional part of the market value of the right to subscribe for such new stock at the time such subscriptions are made.

4th.　In the event that the trust entitles the *cestuis que trust* to receive as annual rents, dividends, increase and income, any share of the benefit accruing to the trust fund by reason of the increase of stock by the Ætna Insurance Company, in what proportion does the benefit go to the *cestuis que trust ?*

The Superior Court has asked the advice of this court upon these questions.

A shareholder has no proprietary interest in the accumulated profits properly retained by a corporation for the protection of its capital; he cannot acquire one by summoning it to make a rest in its business and take an account of them; he first obtains one when it has either in fact, form or intent set his proportion thereof as a dividend to his individual credit.　This, of course, is the measure of the right of a life tenant; there is to him only a possibility that the profits may be divided, or that the use of them by the corporation may increase its dividend during his term.

In the case before us, neither in fact nor form did the corporation make any division, or part with any portion of its earnings in behalf of the stockholders.　On the contrary it manifestly desired to retain its surplus intact and increase its strength by the addition of a million of dollars to its capital; its accumulated earnings all remained its property and subject to the risks of its business.　It offered to the shareholders the privilege of paying in this sum; investors were of the opinion that this privilege was worth a premium;

not because it carried with it the right then or ever to demand any portion of the surplus retained in good faith by the company, but presumably because they believed that from the income from its capital, surplus, and business, it would make regular dividends largely in excess of the ordinary rate of interest.

The increase in market value above cost of the shares constituting the capital of this fund, resulting either from an accumulation of profits by the corporation or from its vote to permit each one of its proprietors to purchase a fraction of a new share because he was the owner of an existing one, belonged to and formed a constituent part of this last, and of course of the capital. If the trustees had sold the existing share, and thereby had realized the increased value resulting from either of the mentioned causes, the entire proceeds of the sale would have still formed a part of the capital; and the excess in market value above cost of the right to purchase such fraction also belongs to and forms a constituent part of the existing share and of course of the capital; and when the trustees realized this excess by a sale of the privilege, the proceeds remained a part of that capital. In short, all of the increase of value which is realized from the act of the trustees in selling either the existing share with the privilege annexed, or the privilege severed therefrom, belongs to the capital; purchasers pay it from their money; all that is realized from the act of the corporation in making dividends belongs to the life tenant. *Atkins* v. *Albree*, 12 Allen, 359; *Moss's Appeal*, 83 Penn. St., 264. And this regardless of the question whether profits were accumulated before or after the purchase of shares by the trustee; if before, and a dividend is made immediately after, it is the good fortune and the property of the life tenant; if after, and the corporation does not divide them during the life tenancy, it is the advantage of the remainder-man. Each must take the risk of his time, both as to the success of the business and as to the action of the directors in the matter of dividends.

Again, it is said that the will, which is the law of the

case, requires the transfer of these forty shares to the life tenants, by the requirement that the trustees shall annually pay to them "the rents, dividends, increase and income" of the trust fund; that in the life of the testator the company had on three occasions increased its capital; that he foresaw that it would do so again; and that the word "increase" points to such an event. But, looking at the whole instrument, we are unable to find therein expressed any other intention in reference to that part of the fund invested in Ætna Insurance stock, than that his children should receive all that the company should actually separate from its funds and set to the trustees as dividends thereon.

The Superior Court is advised that the forty-seven shares paid for are a part of the principal of the fund; to be retained by the trustees as such.

In this opinion the other judges concurred.