RHODE ISLAND HOSPITAL TRUST CO., Trustee *vs.* HELEN McHENRY BRADLEY *et al.*

April 17, 1918.

PRESENT: Parkhurst, C. J., Sweetland, Vincent, Baker, and Stearns, JJ.

*(1) Wills. Income. Life Tenant. Remainderman.*

Testator bequeathed the residue of his estate in trust, to pay the income dividends and profits to his wife for life, and to hold the remainder in perpetuity

for the benefit of a public charity to be created, instructing the trustee to pay over to the Board of Trustees of the charity "such reasonable sum from the income of the said remainder as due regard for the future maintenance of said Home and prudent management may dictate, for the purpose of establishing the Home," and thereafter to collect and receive "the rents interest dividends and income" and "pay over the net income" to the Board of Trustees for the purposes mentioned in the will.

The trust estate contained certain shares in a land company and three land trusts. In the case of the land company, the entire capital stock was represented by the land held by it; this land the company held for years waiting until in the course of time it increased in value, then platting and selling it.

*Held,* that in this the company was using only its capital which was solely land, in paying the expenses, and was converting its capital into money and then distributing the capital so converted among the shareholders.

*Held,* further, that all dividends upon the stock of the company and dividends paid under the land trusts were in liquidation of the par value of the stock and of the capital of the trusts and were wholly paid out of the net proceeds of the conversion of the capital of the company and the trusts into money by the sale of land.

*Held,* further, that the life beneficiary was not entitled to any apportionment on the theory that the securities being such as would not be suitable for trustees to hold, might be treated as if converted into cash at the date of testator's death and a capital sum established upon which interest could be allowed to the life beneficiary in lieu of income which she had not received, since the trustee was expressly authorized to continue the investment even if hazardous and doubtful."

*(2)   Wills.   "Income."*

Whatever rule is adopted as to the distribution of dividends between life tenant and remainderman, the words dividends, profits, earnings and all similar words and phrases are not sufficient in the absence of more explicit directions to indicate any intent that is not equally well expressed by the word "Income."

*(3)   Wills.   "Income."*

The use in a will of the words "income dividends and profits" or any of the other language or provisions of the will did not indicate an intention on the part of the testator that the life beneficiary should receive as part of her income payments which were not dividends of profits, but payments of sums of money realized from sales of capital in the course of a gradual liquidation or conversion of the capital of a land company and of certain land trusts into money for the benefit of all parties interested.

*(4)   Wills.   "Income."   Evidence.   Ambiguity.*

On a bill in equity for construction of a will testimony of the widow who was life beneficiary as to the actual intention expressed to her by the testator

that she should have as a part of her income under the trust all of the moneys that might be distributed by a land company and certain land trusts was inadmissible, there being no such latent ambiguity as to the subject of the gift as to warrant the admission of parol testimony as to the actual intention of testator.

*(5)   Wills.   Income.   Evidence.*

Under a will bequeathing "income dividends and profits" to a life beneficiary, on the question as to whether a "dividend" should properly go to the life beneficiary or to the remainderman, the only testimony proper to be received outside of the terms of the will is such as will show what has been the action of the corporation in declaring a dividend or making a distribution to shareholders and from what source the dividend or distribution has been derived and the court will then say as a matter of law whether the dividend has been such that it is to be deemed income or principal.

*(6)   Wills.   Income.   Life Tenant.   Remainderman.*

The distribution of sums of money arising from a conversion of capital into money in either partial or gradual or complete liquidation of capital value belongs to the *corpus* of the trust fund as capital for the benefit of the remainderman, and the life beneficiary has only the right to such income as shall arise upon the reinvestment of the fund so received.

BILL IN EQUITY for construction of will.

PARKHURST, C. J.   This bill in equity is brought by the residuary trustee under the fifth clause of the will of George L. Bradley for the purpose of ascertaining whether certain cash dividends declared and paid on certain shares (in one Land Company and in three Land Trusts), which the testator owned at the time of his death and which the residuary trustee has since retained as a part of the residuary trust estate should be paid to the respondent Mrs. Bradley during her life or should be retained for the benefit of the residuary remainderman.

The bill alleges that the residuary trust estate is more than sufficient to pay all legacies payable under the will upon the decease of the equitable life beneficiary regardless of the outcome of this suit and that an award of the cash dividend forming the subject matter of this suit to the residuary remainderman would "only increase the residue remaining after the payment of said legacies;" and for that reason the only parties respondent are the testator's wife, who is the

equitable life beneficiary and the Attorney-General of the State of Rhode Island, who appears for the residuary remainderman, the Emma Pendleton Bradley Home, a public charity to be created in the manner and for the purposes set forth in the will.   Answers and a replication were duly filed; and, all of the parties having executed a stipulation which admits the truth of facts material to the relief sought, the cause was certified to this court under Gen. Laws (1909) Chap. 289, Sec. 35, as ready for hearing for final decree, being a bill for the construction of a will and for instructions.

The testator, George L. Bradley, died a resident of Pomfret, Connecticut, on March 26, 1906, leaving as the only survivors of his immediate family his wife and their invalid daughter, Emma Pendleton Bradley, who has since deceased.   He left a will dated November 1, 1904 (a printed copy of which, marked "Exhibit A" is filed in this cause), which recites that the testator was then of Pomfret, Connecticut, and which has since been probated by the probate court of that town.

By the *Fifth* clause of this will the testator gave the entire residue of his estate (which included his entire net estate except a permissive gift of sums of money not to exceed $20,000 to his wife for her use immediately following his decease and a gift to her of his wearing apparel) to the complainant in trust during the life of his wife (1) to permit her to occupy his residence estates in Pomfret, Connecticut and Washington, D. C., including the furnishings and equipment thereof, free from all rent, taxes and charges of whatsoever nature, and also free from all liability for waste or to account; and (2) subject to her use of his residence estates to collect and receive the "income, dividends and profits arising from said residuary trust estate, howsoever invested" and, after deducting therefrom the trustee's expenses and certain permissive payments, to pay "the balance of said income, dividends and profits to my said wife for her own use during her life;" and upon further trust after the death of his wife (1) to make certain specific gifts, devises and pecuniary

legacies to certain persons named; (2) to set aside certain special trust funds for specified purposes; and (3) to hold the remainder of his residuary trust estate in perpetuity for the benefit of the Emma Pendleton Bradley Home, a public charity to be created in the manner and for the purposes set forth in the will.

We are not concerned with the specific gifts, etc., nor with the special trusts above referred to.

In providing for the administration of the remainder of the residuary trust estate for the benefit of the charitable residuary remainderman, the Emma Pendleton Bradley Home, the testator instructed his residuary trustee (1) to apply or pay over to the Board of Trustees or the corporation having the management of the Home "such reasonable sum from the income of the said remainder of my residuary trust estate as due regard for the future maintenance of said Home and prudent management may dictate" for the purpose of establishing and equipping the Home; and (2) thereafter to collect and receive "the rents, interest, dividends and income" arising from such remainder and after deducting expenses, etc., to "pay over the net income as the same shall accrue" to the Board of Trustees or the corporation having charge of the Home for the purposes mentioned in the will. Subject to the right of his wife to occupy his residence estates during her life, the testator gave his residuary trustee the usual discretionary power to sell, lease, invest and reinvest all or any part of the trust estate "either within or without the States of Connecticut and Rhode Island, in safe and productive stocks, bonds, mortgages or other safe securities, or in real estate." He also gave his residuary trustee express power "to continue so long as my said trustee may think best, any part or parts of my said residuary trust estate in the form or investments in which the same may happen to be at the time of my decease even if hazardous and doubtful;" and especially requested the retention of two investments, one of which was in the Mergenthaler Linotype Company and one of which was in

the Newport Mining Company, because he desired his estate to "have the benefit of the liberal rates of income which they yield."

The residuary trust estate which came into the possession of the residuary trustee at the testator's death contained (among much other property) shares in a Land Company and three Land Trusts, as follows: 459 shares of the preferred stock and 479 shares of the deferred stock of an aggregate par value of $93,800 in the Boston & Florida Atlantic Coast Land Company, a Maine corporation organized by the testator and four associates in November, 1891; 29 shares in the Lake Worth Land Trust, a Declaration of Trust executed by the trustee and approved by the testator and three others on May 27, 1892; 50 shares in the New River Land Trust, a Declaration of Trust executed by the trustee and approved by the testator on May 28, 1892; and 100 shares in the Walker Land Trust, a Declaration of Trust executed by the trustee and approved by the testator and six others on February 4, 1898. These shares were all acquired by the testator long prior to his death and to the execution of his will and have been retained and are now held by the residuary trustee as a part of the residuary trust estate.

The Boston & Florida Atlantic Coast Land Company was organized with power to buy and sell land and its capital stock, which was fixed at $200,000, was divided equally between preferred and deferred stock into shares of the par value of $100 each. Both classes of stock were given equal voting rights at all times during the existence of the corporation, but the preferred stock was entitled to receive all dividends declared and paid by the corporation until the aggregate amount of such dividends equalled the par value of the preferred stock plus 6% annual interest on the par value of such preferred stock from the date of issue to the date of final payment, after which the deferred stock was entitled to receive all dividends subsequently declared and paid. The by-laws of the corporation also provided that a Board

of Directors, who were to be elected by the stockholders, should have general power to manage the business and affairs of the corporation, with special power (1) to declare dividends on the capital stock, and (2) to purchase any and all lands which they might deem necessary or beneficial to the business of the corporation and to issue its capital stock in payment therefor.    In addition to being one of the organizers of and an original shareholder in the corporation, the testator served the corporation as a director and vice president from the date of its organization in 1891 until the date of his death in 1906 and was thoroughly conversant with its business and affairs.

The Declarations of Trust under which the three Land Trusts were organized are each in substantially the same form.    Each recites that the shareholders named therein had contributed funds which had been used in the purchase of certain tracts of land in the State of Florida that day conveyed to the trustee or trustees named therein, in trust "for the purpose of cultivating, improving and selling or disposing of the same" for the benefit of the shareholders. Each Declaration of Trust also provides that the "shareholders are not to have any interest in or title to the trust property itself held from time to time by the trustee and shall have no right to partition except as hereinafter stated but the shares shall be personal property carrying the rights of the division of profits and other matters concerning the trust property;" and that "the death of a shareholder shall not operate to determine the trust or entitle his legal representatives to an account or to take any action against the trustee, but the legal representatives or assigns of the decedent shall succeed to all his rights hereunder upon the surrender of the certificate of his share."

The *Fifth* clause of each Declaration of Trust provides that, "The proceeds of sales of said land, income derived from its cultivation and other receipts of said trust property shall be divided ratably by the trustee from time to time, as he may determine, among the shareholders of record at the

time a dividend is declared.   Dividends shall be declared
on the order of holders of record of not less than ————
shares, but the trustee may always retain such an amount as
he may deem necessary to pay any debts and lawful expenses
of the trust."

Subsequent clauses also prescribe the form of certificate
for the shares to be issued thereunder, the method of calling
meetings of the shareholders for the purpose of instructing
the trustees, and the manner of voting by proxy or otherwise.

The original term for which each trust was created, viz.:
fifteen years, has been extended from time to time by the
interested parties in accordance with the power of amend-
ment contained in the trust agreements and each of them is
now in force.   The testator was one of the organizers of each
of the Land Trusts and a shareholder therein from the
respective dates of their organization in 1892 and 1898 until
the date of his death and was thoroughly conversant with
their business and affairs throughout that period.

In January, 1892, the Boston & Florida Atlantic Coast
Land Company by an appropriate vote of its Board of
Directors purchased 100,000 acres of vacant and unimproved
land located in the State of Florida and issued in payment
therefor all of the capital stock of the corporation, both pre-
ferred and deferred, except five organization shares then
outstanding;  no additional purchases of land either by the
Land Company or by the Land Trusts have been made since
the respective dates of their organization and they are now
and have been exclusively engaged in selling the large tracts
of land so acquired by them at or directly following organi-
zation, in small parcels to customers who might be expected
to develop the parcels so sold and thus enhance the value of
the adjoining unsold land;  no such sales are shown to have
been made in the lifetime of the testator.

These sales of land have been conducted under the super-
vision and control of  the  respective officers, directors and
trustees of the Land Company and Land Trusts, who have
done all such acts as are necessary and incidental to the sale

of the lands, among which are the following, viz.: the surveying and platting of the lands into small lots or parcels and the determination and revision from time to time of the prices, terms and conditions of the sale of said platted parcels; the selection, appointment and discharge of agents located in the State of Florida and the supervision and direction of their efforts to secure purchasers for said lots and parcels of land; the negotiation and execution of large numbers of contracts for the sale of said platted parcels of land and the preparation and execution of deeds conveying said parcels to the purchasers upon the completion of the purchase price; the collection, usually in installments, of the purchase moneys due under said contracts and making necessary adjustments in case of inability of the purchaser to pay in accordance with the terms of his contract; the payment of taxes, agents' commissions, salaries and other expenses incident to the carrying on of said business; and, in general, the performance of all acts incident to the business of promoting and consummating the sales of said lands at the best prices therefor, substantially all which allegations are set forth in the answer of the respondent Mrs. Bradley and admitted to be true by stipulation.

From time to time, since Mr. Bradley's death, the directors and trustees of the Land Company and of the respective Land Trusts have declared and paid cash dividends which have constituted the only return which the shareholders have ever received on account of their ownership of the shares aforesaid. All dividends to date have been declared and paid out of the net proceeds of the sales of land, each dividend has been declared and paid out of the difference between the gross receipts arising from the sale of said lands in small parcels and the cost of preparing for and carrying out said sales; and it is claimed that the fair cash value of the assets of the Land Company or trust declaring the same exceeded by an amount in excess of the dividend so declared and paid, all of its liabilities, including as a liability in the case of the Boston & Florida Atlantic Coast Land Company,

the par value of its capital stock, and in the case of the Land Trusts the aggregate amounts contributed by the shareholders to the purchase of the trust lands; and at the present time the unsold lands of the Boston & Florida Atlantic Coast Land Company are claimed to have a fair cash value in excess of $600,000 as against a capital stock of $200,000 and the present fair cash value of the lands remaining under each of the Land Trusts is claimed to exceed the original amounts contributed by the shareholders to such Land Trust.

It should be noted in this connection that nowhere in the bill or in the answer of the respondent Mrs. Bradley, or in the stipulation admitting the facts therein stated, does it appear what amount in cash was ever contributed to the Land Company or to the Land Trusts by any of the parties interested therein; or what was the cost of said lands; or what amounts have since been expended by either the Land Company or the trustees under the Land Trusts in the management thereof; nor does it anywhere appear definitely what are the values of the lands remaining unsold. It should also be noted that it does not appear in either of the three Declarations of Trust what was to be regarded or deemed to be the capital value of the lands, included within the terms of the trusts or either of them.

The aggregate amount of the cash dividends received by the residuary trustee on account of its ownership of the shares in the Land Companies since the testator's death is as follows: $37,000 on the 459 shares of preferred stock of the Boston & Florida Atlantic Coast Land Company; $28,000 on the 29 shares in the Lake Worth Land Trust; $5,500 on the 50 shares in the New River Land Trust; and $4,600 on the 100 shares in the Walker Land Trust. Dividend payments on the preferred stock of the Boston & Florida Atlantic Coast Land Company have averaged less than 6% on the par value thereof; and in a majority of cases, individual dividends have not exceeded that rate. No dividends of course have yet been declared or paid on the deferred stock of the company.

In addition to the foregoing facts regarding the organization of the Land Companies and their method of operation, the parties hereto have also agreed that if the respondent Helen McHenry Bradley were called and permitted to testify she would testify that the testator took a great deal of interest in the Boston & Florida Atlantic Coast Land Company and the various Land Trusts; that it was his habit to talk with her frequently about the business affairs of these Florida investments; and that in the course of these talks, some of which occurred before and some after the execution of the testator's will, the testator "commonly, habitually and frequently referred to the payments which he expected would be made to the shareholders by the Boston & Florida Atlantic Coast Land Company and the various Land Trusts as dividends."

She would also testify that just before his death the testator asked the respondent particularly if she was satisfied "with the provisions regarding the dividends which he expected would be paid by the Boston & Florida Atlantic Co. and the various Land Trusts, explaining that he had so provided in his will that all payments made by the Boston & Florida Co. and the Land Trusts, to the shareholders during her lifetime would go to her;" that he referred to these payments as "dividends" and talked about the probable sufficiency of the respondent's income from that source; and that the testator also expressed his strong belief that the "dividends" from these investments, viz.: in the shares of the Boston & Florida Atlantic Coast Land Company and the Land Trusts would be substantial during the life of the respondent and questioned her closely as to whether she shared in his belief that a good income from these sources was assured her, stating positively that unless the respondent was absolutely satisfied on this point he would "break his will" and make another by which the respondent should be given the shares outright in the Boston & Florida Atlantic Coast Land Company and in the Land Trusts so that if the yield from the securities was not as large as anticipated the

respondent could realize on the investments by selling some of the shares.

Counsel for Mrs. Bradley, the life beneficiary, urgently claim that these dividends should be assigned to her under the terms of the trust; it is claimed that the terms of the will, read as a whole, are sufficient to show that where the testator uses the words "income, dividends and profits arising from said residuary trust estate, however invested," and "the balance of said income, dividends and profits to my wife for her own use during her life," the words are so broadly inclusive as to manifest an intent that all "dividends" of whatever nature or from whatever source should be paid over to his wife as income under the trust.    The words "income, dividends and profits" are of such common use in wills, as appears from the very large number of cases cited on the briefs of the parties, and are so frequently used when applied to miscellaneous estates of this character, that we are unable to find that they should be regarded as of especial significance as to the matter of intention here involved.

Sufficient appears from the will of Mr. Bradley to indicate that he left a large estate.    He refers to certain investments —more especially to that in the Florida Coast Line Canal & Transportation Company in which he was very largely interested and which he says was in the process of construction. He also refers to his investments in the Mergenthaler Linotype Company and Newport Mining Company by saying, at foot of page 8 of the printed copy of his will:   "Having great confidence in the intrinsic value of my investments in the Mergenthaler Linotype Company and the Newport Mining Company, and desiring that my estate shall have the benefit of the liberal rates of income which they yield, I recommend to my said trustee, but without intending to control the exercise of the discretion hereinbefore granted, that in considering the disposition of such investments, it give weight to the rate of income, even at the risk to some extent of the principal;  and I hereby exonerate my said

trustee from all responsibility on its part by reason of continuing any of said investments." But the testator makes no specific mention of the shares of the Boston & Florida Atlantic Coast Land Company nor of the shares of either one of the three Land Trusts upon which the dividends here in question were received. All these shares pass as a part of the general residue of the estate without special mention. That residue is to be held in trust, and the trustee is authorized and directed "to collect and receive the income, dividends and profits arising from said residuary trust estate, howsoever invested;" and after paying therefrom various expenses and giving authority to make advances from the income for the benefit of the canal company, etc., the testator ends the directions to his trustee thus: "and to pay the balance of said income, dividends and profits *to* my wife for her own use during her life."

The absence of any specific reference to the stocks of the corporation and Land Trusts here in question, or to the income or profits to be derived from them is emphasized by the specific reference to the income to be derived from the Mergenthaler Linotype Company and Newport Mining Company, to which we have called attention above. It is significant also that the words above quoted "desiring that *my estate* shall have the benefit of the liberal rates of income that they yield" cannot be construed as showing any preference of the interest of the life beneficiary over the interest of the remainderman in regard to the particular investments referred to in that part of the will.

As to the question whether there is any evidence in the will taken as a whole that the testator manifested any intention as to the dividends here in question to prefer the life beneficiary to the remainderman, in view of the emphasis laid by counsel for such life beneficiary in their brief upon the statement of the bill "that an award of the cash dividends forming the subject matter of this suit to the residuary remainderman would '*only increase the residue* remaining after the payment of said legacies,'" it is well to refer to

certain language of the will used by the testator in reference to the Emma Pendleton Bradley Home (page 19 of the printed will): "The provisions of my will concerning the Emma Pendleton Bradley Home, and the like provisions of the will of my wife, are in fulfillment of our common purpose that the remainder of our estates after both of us are dead, and the other provisions of our respective wills have been carried out, shall be used for the perpetual maintenance of the charity I have indicated; such purpose of ours arising particularly from our special sympathy with those who suffer from disease, because our child whose name said Home is to bear has been so afflicted through life.   Out of this misfortune of our only child has grown the purpose and the hope that from the affliction of this one life may come comfort and blessing to many suffering in like manner."

In view of these words, it is quite impossible to infer that the testator, while he was most generous in his provision for his widow, was not equally solicitous for the ultimate benefit of the noble charity which is thus shown to have been very dear to the hearts of both the testator and his wife.

In the brief for the life beneficiary, we find counsel constantly using the words "*ordinary cash dividends*" as applied to the dividends here in question.   It is true that these dividends were the *only* dividends declared and paid to the complainant trustee upon the shares above referred to; but it is quite evident that these dividends were in fact *dividends in liquidation* and not *ordinary cash dividends,* as those words are used in the cases cited.   It is undisputed that the entire capital of the Land Company (except five organization shares issued to the persons who organized the company) was issued in payment for the 100,000 acres of land acquired by the company soon after organization; it does not appear that any money passed to the company in payment for a single share of the stock at any time; it will be assumed that the entire capital stock of the Company was represented by the land held by it; the company holds the land for many years, does not either cultivate it or lease

it or use it in any manner for profit derived from the use of it. The Company simply waits until in the course of time the lands increase in value, and then, by its judicious management in platting the land and selling it in small parcels to purchasers who will improve and cultivate their parcels, succeeds in getting enhanced values for the parcels sold, perhaps partly by reason of a general increase in the demand for lands in certain parts of Florida, partly by reason of increased facilities for transportation, thereby bringing the means of getting produce to market, perhaps partly by reason of the judicious use of the moneys gradually from time to time acquired by sales of land in further preparing for and paying the expenses of the subsequent sales. In all this the company was using only its capital (which was solely land) in paying all the expenses incident to surveying, platting and all its other expenses of sale, and was converting its capital into money, and then distributing the capital so converted into money among the shareholders to whom it belonged. It may be noted in this connection that the very organization of the Land Company (as above shown) provided that all dividends should be first applied to the preferred stock until it should be fully paid off with six per cent. interest, before the deferred stock should receive anything, and that thereafter the deferred stock should receive all dividends. It is so plain as to require no further statement or argument that all of the dividends so far paid upon the preferred stock of the Land Company have been in liquidation of the par value of the preferred stock, and have been wholly paid out of the net proceeds of the conversion of the capital of the company into money by sale of the land.

The same thing, substantially, may be said as to the dividends paid by the trustees under the Land Trusts. They all represent the capital of the Trusts, converted into money. The briefs treat all the dividends, whether from the Company or the Trusts, as bearing the same relations to the capital in the one case as in the other. We see no basis for distinction between them so far as the question here involved

is concerned.   These Land Trusts are quite similar in their general features to the joint stock companies referred to in *Oliver's Estate*, 136 Pa. St. 43, where dividends on shares in such companies are treated in the same manner as dividends on stocks in corporations, so far as the question of distribution as between life beneficiary and remainderman is concerned.   See also *Thomson's Est.*, 153 Pa. St. 332, 338; *Spooner* v. *Phillips*, 62 Conn. 62, 70; *D'Ooge* v. *Leeds*, 176 Mass. 558, 561.

The entire question under this branch of the case—that is, with reference to the intent of the testator so far as it is expressed in his will—is therefore reduced to this:   Do the words "income, dividends, and profits" indicate an intention on the part of the testator that the life tenant should have these dividends or payments as income?   A very considerable number of cases have passed upon this question, and we find that they have uniformly come to the conclusion that "dividends," "profits," "earnings," and all similar words and phrases are not sufficient, in the absence of more explicit directions, to indicate any intent that is not equally well expressed by the single word "income," and this appears to be so, whatever rule is adopted, as to the distribution of dividends between life tenant and remainderman.   "Income" as used in a will bequeathing stock, means the same thing as "dividend."   *Lauman* v. *Foster*, 157 Ia. 275, 279 (1912). *In re Heaton's Estate*, 89 Vt. 550 (1915) the court say (p. 554):   "It is worthy of notice that the American courts view the question from a common standpoint.   They all expressly or impliedly recognize that the question whether a distribution made by a corporation during the continuance of a life estate is to be regarded as income or as capital is primarily one of construction,—a question of the intention of the creator of the trust manifested by the will or other instrument by which the right to the income is, for the time being, severed from the *corpus*.   The difficulty arises when the will or other instrument merely directs the payment of 'earnings' or 'income' or 'dividends' to the life tenant and

is not sufficiently explicit for the guidance of the court when the distribution . . . is of an unusual or extraordinary nature." . . . "Having in mind that the intention of the testator is to control if it can be gathered from the will, we have carefully examined its provisions in the light of the surrounding circumstances but find there no satisfactory solution of the question. The provision that all the income of the trust fund, the bank stock in question, 'by way of interest, dividends, rents and profits' should go to the life tenant is broad enough to include by implication this stock dividend. The word 'dividend' considered with its context might mean more than ordinary cash dividends; but the will lacks certainty on this point, there not being enough in the will to make it clear that the testator contemplated such a dividend as the one in controversy, so we must look to the law to determine whether it should be regarded as income of the trust fund or as a part of the fund itself." (p. 571). "It is also said that the life tenants are not entitled to the enhanced value of the *corpus* of the fund, instancing the increase in value of the real property that forms part of this trust estate; but there is a clear distinction between accretions to the fund derived from earnings accumulated during the term and the enhanced value of the trust property due to other causes. The one is properly income while the other is not."

In *Boardman* v. *Mansfield*, 79 Conn. 634, the court say (p. 637): "The words 'dividends, rents and profits,' upon which reliance is thus sought to be placed, are no more comprehensive, as applied to personalty, than would have been 'net income' used in their stead." (Citations of Connecticut cases.) "Whether the testator makes use of the expression 'dividends,' or 'dividends and profits,' or 'dividends, interest, and profits,' or (as in this case) 'interest, dividends, profits and proceeds,' I look upon all of them, to come to the same thing, and that this is too nice a circumstance to found any distinction on.' *Hooper* v. *Rossiter*, 1 McCl. (Eng. Ex.) 527, 536."

In *Carter* v. *Crehore*, 12 Hawaii, 309, the court say at p. 311: "But usually the creator of the trust does not contemplate extraordinary dividends, whether cash or stock, or have in mind the particular period during which the profits out of which they are paid were earned, and therefore he makes no special provisions in regard to them.   He usually, as in the present case, directs merely that the income, dividends, proceeds or profits, as the case may be shall be paid to one for life with remainder over to another.   What then shall be done with dividends, in regard to which he had no special thought one way or the other?   In other words what is to be considered as income from the stock within the meaning of the instrument creating the trust and within the general intention of the creator of the trust?"

In *Bryan* v. *Aikin* (Del.), 82 Atl. 817 (p. 819), the court say: "There is no testamentary guide.   By the will of James C. Aikin the trustees are directed to pay to the life tenant the net income, interest and dividends, on the trust fund, and this language does not indicate the intention of the testator as to the point disputed.   Even the use of the word 'dividends' does not, according to all the cases, indicate such intention."

The chancellor adopted the Massachusetts or Kentucky rule and the case was reversed on appeal, the Supreme Court of Delaware adopting the Pennsylvania rule,—*Bryan* v. *Aikin* (Del.) 86 Atl. 674; but the upper court do not make any question as to the proper construction of the will by the chancellor.

In *In re Hopkins' Trusts*, L. R. 18 Eq. 696, there was a gift of "dividends, interest and income" for life, and Hall, V. C., held that the particular dividend there in question belonged to the life tenant; but, he said (p. 699): "I am of opinion that in the present state of the authorities on this subject the tenant for life is entitled to these dividends, unless, as has been contended, they were paid by the office out of capital.   If, indeed, that were so, whether they were

called bonus or dividend, they would be payments out of capital, and therefore capital, and would belong to the remaindermen and not to the tenant for life." See also *Spooner* v. *Phillips*, 62 Conn. 62, 68 ("Dividends and Income"); *Gibbons* v. *Mahon*, 136 U. S. 549, 568.

(3)    In view of the considerations above set forth we do not find that the use in the will of the words "income, dividends and profits," or any of the other language or provisions of the will indicate an intention on the part of the testator, that the life beneficiary should receive as part of her income these payments, which as we have shown above are not dividends of profits in the sense in which these words are used in the cases cited, but are payments of sums of money realized from sales of capital in the course of a gradual liquidation or conversion of the capital of the Land Company and of the Land Trusts into money for the benefit of all parties interested.

This brings us to the question whether the testimony offered by Mrs. Bradley as to the actual intention expressed to her by the testator that she should have as a part of her income under the trust all of the moneys that should be distributed by the Land Company and the Land Trusts, is admissible. We are clearly of the opinion that it is not. If the testator intended that Mrs. Bradley should have all the moneys realized from the sale of these lands, it would have been easy to have so provided by special directions or by giving to her outright the shares of stock referred to. He did not do so, but threw them, without special mention, into the *corpus* of the trust fund created for her benefit during

(4)    her life and for the ultimate benefit of the charitable remainderman. The fact that the testator in his lifetime expressed an intention as above set forth, and talked it over with his wife and agreed "to break his will" if she were not satisfied shows that there may have been some doubt in his own mind whether or not his will carried out any such intention. He made two codicils: the later codicil bears date December 7, 1905; he died March 26, 1906. It appears

from Mrs. Bradley's affidavit that the probable amount of the moneys to arise from the sales of the Florida lands was a subject of frequent conversation between husband and wife, before and after the date of his will and down to his death; and that he expressed his opinion that he had so provided in his will that all such moneys as were realized from that source would go to her as a part of her "income." He could easily have made that provision certain had such been his intention.

As we have above shown we do not find any such intention expressed in the will. If the testator thought he had expressed any such intention he was plainly mistaken as a matter of law.

We do not find, upon due consideration of the will here in question, any such latent ambiguity as to the subject of the gift under the trust for the life beneficiary as has been held in any case cited to warrant the admission of parol testimony as to the actual intention of the testator. The ambiguity, if any exist, is as to whether the words "dividends" and "income" include within their scope such cash payments as have here been made to the trustee. Such ambiguity (if it be called such) is fully resolved when we consider, as above, the source from which these "dividends" are derived. The facts as to that are fully set forth in the bill and answer, the material statements of which are admitted to be true by stipulation; and the facts show that these "dividends" are purely and solely made from conversion of capital. We find no case cited in which it has been attempted to supplement or add to the express terms of the will by testimony outside the words of the will itself to show the testator's intention in such a matter. The only case cited which appears to us to be analogous to the case at bar is the case of *Mann* v. *Executors of Mann*, 1 Johns. Ch. 231, where it was contended that a bequest of "moneys" belonging to the estate of the testator was intended by the testator to include bonds, mortgages and notes, and evidence was adduced to show such intention. The evidence was, upon appeal, de-

clared to be inadmissible. The rule is well stated by Chancellor Kent in that case as follows, p. 234: "It is a well-settled rule, that seems not to stand in need of much proof or illustration, for it runs through all the books, from *Cheyney's Case* (5 Co. 68) down to this day, that parol evidence cannot be admitted to supply or contradict, enlarge or vary, the words of a will, nor to explain the intention of the testator, except in two specified cases: 1. Where there is a latent ambiguity, arising *dehors* the will, as to the person or subject meant to be described; and, 2. To rebut a resulting trust. All the cases profess to proceed on one or the other of those grounds." . . . "Perhaps a solitary *dictum* may, occasionally, be met with for there are volumes of cases on the subject of wills, *immensus aliarum super alias cumulus* in favor of the admission of parol proof, to explain an ambiguity or uncertainty, appearing on the face of a will; though Lord Thurlow says, there is no such case." . . . "The only apology for parol proof, in any case, is the necessity of the thing, because the ambiguity is so complete as to elude all interpretation, and would destroy the devise altogether, unless explained. But here is no such difficulty, and no such necessity for resorting to parol proof. The word *moneys* will apply, beyond all doubt, to the cash which the testator left at his death; and the bequest has, at all events, a certain and definite subject on which it can operate. In the late case of *Doe* v. *Oxenden*, (3 Taunt. Rep. 147.) the Court of C. B. considered this fact as a very material circumstance, and one which made the case to differ from all others on the subject of explaining a will by parol proof; because, in all cases that had been before, the evidence was admitted to explain a part which, without such explanation, could have had *no operation.* But in that case, as there was sufficient to satisfy the devise according to the ordinary meaning of the description, collateral evidence, to show that the testator meant to use the description in a more extensive sense, was rejected. There was a similar decision in *Doe* v. *Brown*, (11 East, 441.) and the two cases are strong in respect to this point."

In our State the general rule has been consistently followed.   See *Chapin* v. *Hill*, 1 R. I. 446; *Lewis* v. *Douglass*, 14 R. I. 604.

Many other cases are cited in support of the general principle on the brief of the remainderman.   We find no case sufficiently like the case at bar to warrant a review of such cases.   Nor do we find any case, cited on behalf of the life beneficiary, sufficiently near to the case at bar to support her contention in this matter.   It appears to have been universally conceded in this class of cases that the only testimony necessary and proper to be received outside of the terms of the will is such as will show what has been the action of the corporation or joint stock company or association in declaring a dividend or making a distribution to shareholders and from what source the dividend or distribution, whether of cash or stock, has been derived; and the courts have then undertaken to say as matter of law whether the dividend or distribution has been such that it is to be deemed income to the life beneficiary or part of the principal or capital to be carried into the *corpus* of the trust fund.

The parties to this cause have seen fit, in their able and elaborate briefs to set forth several rules which have obtained in several jurisdictions in this country and in England in the determination of the question whether a dividend or distribution of cash or stock shall be treated as income to go to the life beneficiary or as part of the *corpus* to be held by the trustee for the benefit of the remainderman; and have cited a great number of cases in which such rules have been applied.   Thus the case of *Minot* v. *Paine*, 99 Mass. 101 is cited to illustrate and set forth what is known as the Massachusetts Rule that stock-dividends, although they represent net earnings of the corporation expended upon the plant, shall belong to the *corpus* or capital of the trust fund and not be regarded as income for the life beneficiary; and where it is said on page 108:   "A simple rule is, to regard cash dividends, however large, as income, and stock dividends, how-

ever made, as capital." And the brief for the remainderman also cites a number of later Massachusetts cases showing how this "simple rule" has been modified and applied under varying circumstances, and establishing the principle that "in considering the distribution to determine its character, substance and not form is regarded." (*D'Ooge* v. *Leeds,* 176 Mass. 558, 560). See also *Daland* v. *Williams,* 101 Mass. 571; *Leland* v *Hayden,* 102 Mass. 542, 551; *Lyman* v *Pratt,* 183 Mass. 58, 60; *Heard* v. *Eldredge,* 109 Mass. 258; *Rand* v. *Hubbell,* 115 Mass. 461; *Davis* v. *Jackson,* 152 Mass. 58; *Hemenway* v. *Hemenway,* 181 Mass. 406, 508; *Hyde* v. *Holmes,* 198 Mass. 287.

Again counsel cite cases from Connecticut showing that the courts of that state follow the Massachusetts decisions. *Smith* v. *Dana,* 77 Conn. 543, 550; *Union & New Haven Trust Co.* v. *Taintor,* 85 Conn. 452; from Rhode Island, as following the Massachusetts rule, *Brown & Larned, Petitioners,* 14 R. I. 371; *Greene* v. *Smith,* 17 R. I. 28; *Newport Trust Co.* v. *Van Rensselaer,* 32 R. I. 231; from Ohio as following the same rule, *Wilberding, Admr.* v. *Miller,* 90 Ohio St. 28, 53, 54; see also *Gibbons* v. *Mahon,* 136 U. S. 549, 553; in regard to the Pennsylvania rule, which requires that dividends made from accumulated income or surplus assets, whether in the form of stock dividends or in cash, be given to the life beneficiary under the trust, if the accumulation of income or surplus assets has taken place during the trust, or to *corpus* if all of the accumulation took place before the trust was created, or be apportioned between the life beneficiary and the *corpus,* if part of the accumulation was made before and part after the creation of the trust, citing *Earp's Appeal,* 28 Pa. St. 368; *Oliver's Est.* 136 Pa. St. 43; *Boyer's Appeal,* 224 Pa. St. 144; as showing the New York rule, *Matter of Osborne,* 209 N. Y. 450, substantially adopting the Pennsylvania rule. The briefs also cite many other cases from the same and other jurisdictions; further illustrating these several rules, and the theories and considerations upon which they are based. The question is an

interesting one and has been the subject of much judicial inquiry and much conflict of opinion.   But it is unnecessary in our view of the case at bar to further consider these differing rules or to attempt to review these cases.

(6)   We find that, almost without exception, in all these jurisdictions, whatever the rule may be governing the rights of life tenants and remaindermen as to ordinary cash dividends earned and distributed at certain intervals by corporations doing business in the regular course, or as to extraordinary dividends whether in cash or stock, the distribution of sums of money arising from a conversion of capital into money, in either partial or gradual or complete liquidation of capital value has been held to belong to the *corpus* of the trust fund as capital for the benefit of the remainderman, and that the life beneficiary has only the right to such income as shall arise upon the reinvestment of the fund so received.

We do not find that this precise question had been raised heretofore in this state.   But it arose in Massachusetts in the case of *Heard* v. *Eldredge,* 109 Mass. 258, which holds that a cash dividend of money belongs as principal to the remainderman in a case where the money so divided has been received as compensation paid for part of the real estate of the corporation taken by right of eminent domain; it appeared that the city of Boston took a part of the real estate of the Lewis Wharf Co. to lay out a street, and paid the said company therefor $185,000.   The directors divided $75,000 of this money among the stockholders, among whom were trustees under a will holding stock in trust to pay the income and produce thereof to a life beneficiary.   The court say at page 260: "The appellant contends that the dividend is hers, under the rule laid down in *Minot* v. *Paine,* 99 Mass. 101, and the subsequent cases of *Daland* v. *Williams,* 101 Mass. 571, and *Leland* v. *Hayden,* 102 Mass. 542.   But those cases are quite unlike this.   If the city had taken the whole of the company's land, it would be plain that they had taken its capital.   A dividend of the money received for it would be a dividend of capital, of which the tenant for life ought to

have the income only. The taking of a large part of the land makes no substantial difference in principle. It converts a part of the capital from real estate into personal. No difficult or complicated process is necessary to ascertain what elements enter into the dividend. It is clearly a dividend of a part of the capital; and an impartial execution of the trust will not permit it to be taken entirely away from the remaindermen. The tenant for life should have only the income."

In *Gifford* v. *Thompson*, 115 Mass. 478, the opinion is by Gray, C. J., who was a member of the court when *Minot* v. *Paine* was decided, and who afterwards wrote the opinion in *Gibbons* v. *Mahon*, 136 U. S. 549, frequently referred to as following the Massachusetts rule. The decision is that dividends in liquidation, although paid in cash, belong to the principal. Note that the dividend was $150 per share, and "it was averred that as much as $50 per share out of said dividend of $150 came from such undivided earnings since the probate of the will." The court do not refer to this allegation, but evidently think that the presumption laid down in prior cases, that cash dividends belong to income, is conclusively rebutted when it appears that such dividends are derived from sale of assets. They still apply, however, the simple rule that there shall be no apportionment of the dividend as of the death of the testator, and award the whole to *corpus*. See *Brownell* v. *Anthony*, 189 Mass. 442, in support of the same principle.

In Connecticut where the court follows the rule of the Massachusetts cases in other respects it also awards dividends in liquidation to the *corpus* of the trust fund. *Bulkeley* v. *Worthington Ecclesiastical Society*, 78 Conn. 526, 531, 532.

In New Hampshire dividend in liquidation goes to *corpus*. In *Walker* v. *Walker*, 68 N. H. 407, it was held: "The $200 received from the gas light company, May 4, 1893, and derived from a sale of a portion of its corporate property, which was purchased and represented by the issue of capital stock, was not, either in form or in substance, a division of

earnings, but a division of so much of the capital of the corporation, and as such goes to the remainderman, (*Wheeler v. Perry*, 18 N. H. 307, 314), subject to the payment of interest thereon to the tenant for life."

In *Matter of Rogers*, 161 N. Y. 108, it was held that dividends in liquidation of capital of a corporation should be retained by the trustees as capital, and that all of the other property of the corporation was profits to which the life tenants were entitled.   And see *Thayer* v. *Burr*, 201 N. Y. 155, in substantial accord with case last cited.

In Pennsylvania the same rule is applied in regard to dividends in liquidation of capital.   In *Vinton's Appeal*, 99 Pa. St. 434 (1882) it appeared that the dividend in question was made from the proceeds of a sale of a portion of the plant and franchise of one gas company to another gas company for cash; the court after setting forth the facts says:   "It is thus manifest that the money in dispute comes, not from the annual earnings of the company, but from the sale of part of its property; part of that very *corpus* which the stock shares represent, and without which those shares have neither substance nor value.   If, therefore, the life-tenant is entitled to this money, thus derived from the capital of this corporation, so, in the end, may she come to be entitled to the whole *corpus* of the trust.   For the accomplishment of this result, it is only necessary that the St. Louis Gas Company should effect a sale of the balance of its property, and order a distribution of the money so raised among its shareholders.   But, logically, the effect of such a doctrine is to defeat the whole object of the trust.   Instead of securing for Mrs. Vinton a sure income for life, it gives her the principal to use at her pleasure, whilst the gift over to Frederick Vinton is wholly defeated."

The court refers to *Minot* v. *Paine*, 99 Mass. 101 (*supra*) decided in 1868 and disapproves of the rule therein stated; but fails to refer to *Heard* v. *Eldredge*, 109 Mass. 258 (*supra*) decided in 1872, ten years before Vinton's Appeal, although the doctrine of *Heard* v. *Eldredge* is essentially the same as that of *Vinton's Appeal*.

*Vinton's Appeal* was cited and approved in *In re Eisner's Estate,* 175 Pa. St. 143, 148.   See also *In re Graham's Estate,* 198 Pa. St. 216.

In *Wilberding, Admr.* v. *Miller,* 90 Ohio St. 28, 53, 59, dividends in liquidation were held to belong to *corpus.*

Counsel for the complainant trustee suggest in their brief the question whether or not the life beneficiary is entitled to any apportionment of the sums of money here in question on the theory set forth in many cases that these securities, being such as would not be suitable for trustees to invest in or hold for investment, might be treated as if converted into cash at the date of the testator's death, and that a capital sum might be established upon which interest could be allowed to the life beneficiary in lieu of income which she has not received; citing *Howe* v. *Earl of Dartmouth,* 7 Vesey 137 and numerous cases in England and in this country which follow that case; these cases are based upon the duty either expressed in the will, or implied in law, on the part of the trustee to convert unprofitable and unauthorized securities as speedily as possible after death of the testator.   No such duty rested upon the trustee in this case; but on the contrary the trustee was expressly authorized "to continue so long as my said trustee may think best, any part or parts of my said residuary trust estate in the form or investments in which the same may happen to be at the time of my decease even if hazardous and doubtful"; Mr. Bradley had held these shares for many years without deriving any income therefrom and must have known that it might be many more years, as proved to be the fact, before any sale of these lands could profitably be made; but it also appears very plainly from express language of his will that he had great faith in ultimate value of his Florida investments.   In the cases cited upon this branch of the doctrine of apportionment it appeared that the whole substantial value of the unauthorized securities or property had been realized before suit was brought or should be deemed to have been realized as of the testator's death for the purposes of computation.   In this

case only a portion of the lands has been sold, and there are no facts upon which any computation could be based. The trustees were fully justified by the express terms of the will in retaining these shares as part of the trust fund and in waiting as they have done for the Land Company and the Land Trusts themselves to carry out the process of liquidation. There are no facts before the court, as there were in the cases last referred to, from which it would be possible to capitalize these items of the trust estate so as to permit of any computation of interest which could be allowed upon any portion thereof in lieu of income and we do not find in any of the cases cited any such facts as are here disclosed. Furthermore the life beneficiary makes no such claim to apportionment but claims all of the moneys heretofore paid to the trustee as above set forth as "income, dividends and profits" under the terms of the trust; we find no case here for an apportionment as suggested in the brief for the complainant.

As we have already intimated the increase in the value of the Florida Lands held by this Land Company and by these Land Trusts is merely an increase of capital value due to various causes which have been operative during the years which have elapsed since Mr. Bradley became the owner of the shares. It is impossible to state and it nowhere appears definitely just what those causes have been; the brief for the life beneficiary and the frame of her answer seems to claim that this increase of value is due entirely to the judicious conduct and to the skillful management of the officers and trustees and their agents in the manner and methods adopted for the sale of the land. Even if that be so, and no portion of the increased value is to be attributed to general increase of demand for such lands, to increase of means of transportation of produce to market, to increased demand for such produce, and other general causes, nevertheless the expenses of all that has been done by the officers and trustees and their agents, as has been before shown, have all been paid for out of the moneys derived from the sales, so that it is obvious

that capital in the form of land converted into money by sale has been used for the benefit of the capital still remaining in the form of land; all these dividends therefore represent merely the net amounts from time to time derived from conversion of capital (real estate) into personal property (money). If all these lands, instead of having been vested in the Land Company and Land Trusts by Mr. Bradley before his death had remained in him and passed directly by his will to the trustee with such powers to hold them and to dispose of them in future as are therein given in regard to other property ("even if hazardous and doubtful") and if the lands had become more valuable as time went on and had been gradually disposed of by the trustee itself, the increased value would have inured to *corpus,* in accordance with the principle generally recognized by the cases.

It is a general principle that gains and losses upon change of investment belong to and are to be borne by the *corpus.* In *Outcalt* v. *Appleby,* 36 N. J. Eq. 73, 78, the court say: "The trustees are vested with a discretion as to the time when the conversion of the property, unproductive as well as productive, into money is to take place, and the life-tenants are no more entitled to have the appreciation in value of the one than of the other description of property regarded as income. The appreciation in either case is part of the *corpus.*"  *Slocum* v. *Ames,* 19 R. I. 401, citing *Heard* v. *Eldredge,* 109 Mass. 258, *supra, Gibson* v. *Cooke,* 1 Met. 75; *Matter of Gerry,* 103 N. Y. 445; *In re Connolly's Estate,* 198 Pa. St. 137; *In re Graham's Est.,* 198 Pa. St. 216, 218; *Jordan .v Jordan's Trust Estate,* 111 Me. 124, 130; *Smith* v. *Hooper,* 95 Md. 16 (51 Atl. 844); *Lauman* v. *Foster,* 157 Ia. 275 (135 N. W. 14); *Stewart* v. *Phelps,* 71 App. Div. (N. Y.) 91 (affd. 173 N. Y. 621); *Will of Barron,* 163 Wis. 275, 279, 281; *Hite* v. *Hite,* 93 Ky. 257, 267; *In re Heaton's Est.,* 89 Vt. 550, 571; *Kalbach* v. *Clark,* 133 Ia. 215, 220.

The same principles apply to dividends in liquidation of corporations. The writer of the note in 12 L. R. A. (N. S.) 768 sums up his discussion on page 816, after referring to

the Massachusetts, Kentucky, and Pennsylvania rules, by saying: "But whether or not the courts will undertake to determine the time covered by the accumulation of the fund from which the dividends are declared, it is clear that they must undertake the inquiry whether the fund represents earnings, past or current, or a reduction or change of capital as it originally existed or may have been subsequently enhanced from sources other than the accumulation of earnings; and that in the latter case the dividends, so-called, must be awarded to the *corpus* or the remainderman. This is true whatever rule may be adopted with respect to dividends from earnings."

This court is unable to see any distinction in principle between the case at bar where the moneys come to the trustee through the Land Company and Land Trusts in liquidation and the case suggested where they come directly to the trustee, converting land into money.

Counsel for the life beneficiary refer to certain cases which relate to dividends made by land companies on shares held in trust where it has been held that the dividends should inure as income to the life beneficiary, although it appeared that part of the money distributed or perhaps the whole of it was derived from the sale of land which was part of the capital.

In *Reed* v. *Head et al.*, 6 Allen 174, it appeared that the income of certain shares in two corporations was bequeathed to two certain persons for life; that the companies for some years during the life of the testatrix and afterwards had become land companies (although not so originally); "and that since this change their dividends are made from the avails of the sales of the property which constitutes their capital stock. They are therefore dividing not merely their earnings, but their principal." It was contended that such dividends should not be treated as income; but it appeared that the testatrix had in her lifetime received these dividends; and it appeared that the "income" from these shares was the only bequest to these parties. The court decided that

these dividends should go to the life tenant, saying, page 177: "But in this case the dividends are clearly made as such and are not extraordinary. They are the ordinary dividends, and the principal ones which land companies may be expected to make, and usually comprise a large part of the dividends of water power companies. The testatrix knew this long before her decease, and was in the habit of receiving the dividends. There is therefore no reason to doubt that she understood the meaning of the language used by her. It is true that the whole capital stock may be exhausted by the dividends in the lifetime of the legatees for life; but on the other hand it is quite possible that a large sum will be left in remainder. There is no policy of our law which should influence us in construing this will otherwise than according to the plain intent of the testatrix."

The case clearly rests solely upon *intent as shown by the will*, and is not an authority in conflict with the later cases of *Heard* v. *Eldredge, supra, Gibson* v. *Cooke, supra,* and other cases cited above from Massachusetts and other states, where as a matter of law there being no intention to the contrary to be found in the will, dividends in liquidation are held to belong to *corpus*.

Similar to *Reed* v. *Head, supra,* are the cases of *Matter of James*, 146 N. Y. 78; *In re Nicholson* (1909) 2 Ch. 111; both of these cases related to dividends from land companies, and both were decided upon what the court found upon elaborate examination of the wills to have been the intention of the testator under the terms of the will. It does not appear in either the case of *Reed* v. *Head* or in the case of *In re Nicholson* that the land companies were *in liquidation;* for all that appears they were still and intended to remain going companies, doing business in buying, improving and selling land as a commodity or renting land or leasing land and buildings and retaining part of the proceeds of sales from time to time for the purpose of making further purchases as well as for the expenses of development and sale. And in the case of *In re Nicholson* the judge said

(p. 116):  "The Company has paid very large dividends, but I cannot say that, on the evidence before me, it is established that it has been paying dividends out of capital. On the contrary, the company has realized some of its assets in pursuance of the objects for which it was formed, and all that it has done has been to treat as profits available for dividend the difference between the price it has paid for the assets and the money which it has realized from their sale."

In *Oliver's Estate*, 136 Pa. St. 43, shares in a joint stock company (similar to the Land Trusts in this case) were a part of the residuary trust estate; this company was organized by testator and others in 1862 "for the purpose of purchasing lands, and developing mines of copper and other valuable minerals and disposing of the same;" the company purchased and sold large tracts of land in Michigan and confined itself to the business of speculating in lands, buying and selling from time to time for some years to the extent of about 10,000 acres; and divided the "profits" upon such purchases and sales from time to time among the shareholders.   This continued till about 1882.   Testator died in 1886.   During the period covered by the years 1882 and 1886, however, the company carried on no business other than to continue to hold and pay taxes upon 600 acres of land then held by it; and the shares owned by the testator at the time of his death were inventoried at a nominal amount.   After the testator's death, copper in large amounts was discovered on property adjoining the 600 acre tract of land which the land trust still possessed; and in October of 1888, some two years subsequent to the testator's death, the Land Trust sold 40 acres of this remaining tract of land for the sum of $500,000 cash and out of the amount so realized declared a cash dividend which amounted to $108,849 on the shares held by the trustee of the residuary trust estate.   And it was held that, since the remaining assets of the company more than equalled the original capital contributed by the shareholders to the land trust, the entire amount of the dividend was legally declared and paid

out of the profits as distinguished from the capital of the Land Trust and was therefore "income" arising from the residuary trust estate and payable as such to the equitable life beneficiary.

Here again we have a company organized to deal in land as a commodity, so dealing and speculating in land for over twenty years; then a period of inactivity, followed by a sale of a portion of its land at an enormous profit, with a prospect of further immense profit from adjoining land. The court treated the company as a going concern engaged in business in speculating in land; there is nothing to show that the company was *in liquidation;* its capital still remained unimpaired and for all that the case discloses the company had on hand sums of money received from its profits derived from speculation with which to continue its business; and there is nothing in the case to show that it did not intend to do so. The case was decided upon this view of the facts, and the only real question was whether the "profit" upon the sale should be deemed to have been made before or after the death of the testator, so as to determine whether it was to go to the life tenant or the remainderman under the rule applied in Pennsylvania.

In *Thomson's Estate,* 153 Pa. St. 332, 338, which involved dividends on shares in a land company, the company was dealing in land as a commodity, buying, developing and improving large tracts and selling and making profits; the case was held to be the same in principle as *Oliver's case* (*supra*) and within the rule there laid down; and it is expressly distinguished from *Vinton's Appeal,* 99 Pa. St. 434, from which we have quoted above. The sales and dividends were not in liquidation.

In *Washington County Hospital* v. *Hagerstown Trust Co.,* 124 Md. 1, which involved dividends on shares in lumber companies which were consuming their timber in the manufacture of lumber, and had their capital invested in plants and machinery for the manufacture of lumber and were doing such a business in regular course, and making their

regular dividends of profits, it was held that such dividends were dividends of profits and went as income to the life beneficiary; the companies were not regarded as being in liquidation.

We have already shown by reference to cases *supra,* that in Massachusetts, Connecticut, New Hampshire, New York, Pennsylvania and Ohio, dividends derived from sales of capital are regarded as dividends in liquidation of capital and belong to *corpus* or to the remainderman.

The same is true in Maryland.   See *Ex Parte Humbird,* 114 Md. 627; in Michigan, see *Poole* v. *Union Trust Co.,* 191 Mich. 162; in Wisconsin, see *Miller* v. *Payne,* 150 Wis. 354, 377.

*Miller* v. *Payne, supra,* is very much in point here.. It determines the disposition of a dividend of fifty per cent. on stock of a land company held by trustees as between a life beneficiary and a remainderman; the court says (distinguishing several cases which we have referred to and distinguished above):   (p. 377.)   "It is urged on behalf of Mrs. Payne that the St. Paul Avenue Improvement Company was organized for the purpose of dealing in real estate as a commodity, and that as such it had only two sources of profit, one being the net earnings of the company which are produced when the receipts from the properties exceed the carrying charges thereon, and the other, profits from the sales of its properties at figures in excess of the cost thereof;· and that both such sources of profits are to be considered as the earnings of. such company.   In support of this, reliance is placed upon *Reed* v. *Head,* 6 Allen, 174; *Balch* v. *Hallet,* 10 Gray, 402; *Oliver's Est.,* 136 Pa. St., 43; *Thomson's Est.,* 153 Pa. St., 332; *In re James,* 146 N. Y. 78, 40 N. E. 876.

"In behalf of Mrs. Cameron it is claimed that while the articles of incorporation authorized the St. Paul Avenue Improvement Company to buy, sell, improve, and lease real estate of all kinds, yet it was not in fact a trading corporation in real estate; that it took these lands for the pur-

pose of disposing of the same as soon as practicable and at such an advance in price as it might be able to obtain; and that the moneys received from the railway company for these lands represented simply an enhancement of the balance of the *corpus* of the capital of the company, and not earnings, in the true and ordinary sense of that term.

"We deem the latter claim well taken. Any dividend derived from a mere enhancement of the value of assets representing capital from sources other than the accumulation of earnings belongs to the remainderman and not to the life tenant. It represents *corpus, not income.*" (Citations.) "To this rule there is a well known exception in the case of corporations engaged in buying and selling real estate at a profit, and if the St. Paul Avenue Improvement Company could be considered a trading corporation in real estate within the meaning of the exception to the rule stated, the profits accruing to the corporation, whether derived from an enhancement in the value of real estate or from rents and profits in excess of cost of maintenance, would be considered income and belong to the life tenant. True, the articles of incorporation of the company authorize it to buy, sell, improve, and lease real property, but it appears from the stipulated facts that this property was taken over by some of the directors of the First National Bank for the specific purpose of aiding the bank, and for the further specific purpose of holding and disposing of the same at the earliest opportunity and to the best advantage; that the company never bought any real estate after the death of Mr. Payne; that it sold property from time to time when it could do so to advantage; that its sole purpose was to close out all the properties as soon as practicable, distribute the proceeds among its stockholders, and dissolve the corporation. We have therefore come to the conclusion that this property was held by the corporation the same as any other property is held by an individual or corporation that desires to sell the same at an advantageous price, in the meantime making some improvements thereon and leasing the same to the best ad-

vantage. We deem that the company was not such a trading corporation in real estate as is referred to in the cases cited by counsel for Mrs. Payne."

We have examined with care not only the cases above cited but also the very numerous cases cited upon the briefs, some of which we have not found it necessary to review. In our view of the facts of this case, under the authorities, we are of the opinion for the reasons stated above, that the dividends under consideration in this case were dividends in liquidation of capital of the Land Company and of the several Land Trusts; and that as such they should remain in the hands of the trustee of the testator's residuary trust estate as capital or *corpus* of the trust fund; that all future dividends from the same sources should be held in the same manner; and that the life beneficiary is only entitled to receive such income from the sums of money so received by the trustee as shall be derived from the proper investment of the same under the terms of the trust; and the complainant is so advised.

The parties hereto may present for the approval of the court a form of decree in accordance herewith at such time as they shall find convenient.

*Tillinghast & Collins,* for complainant.

*Swan & Keeney, Francis B. Keeney, Frank H. Swan,* for respondent Bradley.

*Herbert A. Rice, Attorney General,* for State of Rhode Island.